#26914-a-DG

**2015 S.D. 1**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

CHASKE MCDONOUGH,　　　　　　　　　　　Petitioner and Appellant,

　　v.

DOUGLAS WEBER, Warden of the
South Dakota State Penitentiary,　　　　　　Respondent and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
CLAY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE STEVEN R. JENSEN
Judge

* * * *

MANUEL J. DE CASTRO, JR.
Sioux Falls, South Dakota　　　　　　　　Attorney for petitioner
　　　　　　　　　　　　　　　　　　　　and appellant.


MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota　　　　　　　　　　Attorneys for respondent
　　　　　　　　　　　　　　　　　　　　and appellee.

* * * *

ARGUED ON
OCTOBER 7, 2014
OPINION FILED **01/21/15**

#26914

GILBERTSON, Chief Justice

[¶1.]        Petitioner, Chaske McDonough, appeals the First Judicial Circuit

Court's denial of his amended petition for writ of habeas corpus.  McDonough

argues the record did not present a clear factual basis upon which the sentencing

court could have accepted his plea of guilty to first-degree manslaughter.

McDonough also argues that he received ineffective assistance of counsel because

defense counsel did not move to suppress certain incriminating statements

McDonough made and because defense counsel failed to properly advise McDonough

on his right to appeal the sentencing court's decision.  McDonough asks this Court

to issue a writ of habeas corpus and to vacate his guilty plea, the sentencing court's

subsequent judgment, and its sentence.  We deny McDonough's request and affirm.

**Facts and Procedural History**

[¶2.]        On August 11, 2002, after consuming several beers with his friends in

Vermillion, South Dakota, Chaske McDonough threw a beer bottle that broke a

window in a mobile home belonging to the victim, Mark Paulson.  Paulson's body

was discovered in his home two days later, beaten and stabbed twice in the neck.

McDonough soon interacted with several law enforcement officers, including Special

Agent Todd Rodig of the South Dakota Division of Criminal Investigation.  First,

Agent Rodig briefly interviewed McDonough near the crime scene on August 15,

2002.  The next day, Agent Rodig interviewed McDonough a second time at the

Vermillion Public Safety Center[1] (the Center).  On both occasions, McDonough

---

1.      The Public Safety Center houses both the Vermillion Police Department and
        the Clay County Sheriff's Office.

-1-

denied any involvement in Paulson's death. Agent Rodig did not consider McDonough to be in custody at any point during these interviews and did not read a *Miranda* warning to McDonough.

[¶3.] Later in the day, on August 16, 2002, Detective Lowell Oswald of the Vermillion Police Department located McDonough and requested that he return to the Center for additional questioning. McDonough reluctantly agreed, and Detective Oswald drove McDonough to the Center in an unmarked automobile. The vehicle did not have a detention cage, Detective Oswald was dressed in plain clothing, McDonough was not hand-cuffed, and he rode in the front seat with Detective Oswald.

[¶4.] At the Center, Deputy Sheriff Andy Howe, who considered McDonough to be a suspect, conducted the interview. The interview room door was closed and unlocked, although McDonough was not aware that it was unlocked. Although Deputy Howe did not initially read a *Miranda* warning to McDonough, he did tell him that he appreciated him coming to the Center and that he was free to leave at any time. Deputy Howe also assured McDonough that he could go home at the conclusion of the interview, but did not promise that he would never be arrested in connection with Paulson's death. At one point, McDonough asked Deputy Howe, "You think I should have, like, my attorney here?" Deputy Howe told McDonough that he would have to make that choice for himself.

[¶5.] During the interview, McDonough told Deputy Howe two different versions of what occurred on the night of August 11, 2002. At first, McDonough said Paulson reacted by coming out of his house and asking who had thrown the

bottle. McDonough initially denied any involvement, but soon confessed after one of his associates indicated to Paulson that McDonough threw the bottle. According to McDonough, Paulson asked why he threw the bottle and simply requested that McDonough not make any further attempts at throwing bottles over the home. Paulson appeared "nice" and "quiet" and acted "reasonable" by not swearing at McDonough and his associates. Afterward, McDonough went home, shut his door, and went to bed. McDonough claimed that he did not see who was last with Paulson, implying that Paulson was still alive when McDonough left.

[¶6.] The second version that McDonough told Deputy Howe is not as pleasant. In the second version, Paulson was "pissed" that McDonough hit his trailer. He exited his home, shirtless, reeking of alcohol, and hurled profanities at McDonough and his associates. McDonough told Paulson that he had not seen anything break and then suggested they enter the home to search for damage. After they discovered a broken window, McDonough offered to pay for the damage and exited the home. Paulson asked McDonough to reenter his home and, after McDonough did so, Paulson gave him a beer. After the two engaged in conversation for a short time, Paulson abruptly became upset again and told McDonough to leave. Paulson apparently attempted to shove McDonough out the door, but then remembered the matter of his broken window and instead asked McDonough to take a seat and have another beer. After another brief conversation, Paulson suddenly grabbed McDonough by the shirt and held him down where he was sitting. McDonough struck Paulson in the head, broke free, and then struck him four more times in the temple. Paulson attempted to choke McDonough, who struck Paulson

and knocked him down.  Fearing for his life, McDonough grabbed a small knife from a lamp stand and stabbed Paulson twice in the neck as the man attempted to stand up.  McDonough checked his pulse, paced throughout the trailer, threw away the beer cans, threw the knife in some neighboring woods, and later threw away the shoes he was wearing during the confrontation.

[¶7.]	The interview lasted about one and one-half hours with several short breaks.  Although Deputy Howe employed some interrogation tactics, he never raised his voice to McDonough or appeared physically threatening, and McDonough appeared mostly relaxed throughout the interview.  Deputy Howe did not give a *Miranda* warning to McDonough until after he finished recounting the second version of events.  After informing McDonough of his rights, Deputy Howe asked McDonough to write a statement detailing his involvement in the killing.  Despite acknowledging his rights outlined in the *Miranda* warning, McDonough proceeded to write a statement detailing his earlier admissions and also verbally repeated many of the same.  When the interview concluded, Deputy Howe returned McDonough to his home, but McDonough was taken into custody later that evening.  McDonough denied any knowledge of Paulson's sexual preferences—or the possibility of a sexual motive—during the interview.

[¶8.]	The next day, Deputy Howe again interviewed McDonough, who further varied the details of Paulson's killing.  This time, McDonough described Paulson lying face down on the floor, head turned to the left.  McDonough was on top of Paulson, repeatedly punching him in the back of the head.  McDonough then turned around to grab the knife from a table with his right hand and, with the blade

protruding outward from his thumb and index finger, reached across Paulson to stab him in the neck, twice. This account is consistent with both the autopsy, which revealed injuries to the back of Paulson's head, and forensic evidence indicating Paulson was on the floor, or very near it, when he was stabbed. McDonough repeated his insistence, first expressed the previous day, that there was no sexual element to this encounter.

[¶9.] McDonough told yet another version of this story at his change of plea hearing. In this version, Paulson exited his home after McDonough struck it with a beer bottle and an argument ensued. Paulson asked McDonough to enter the home and investigate for damage. The two discovered that the bottle had broken a window, and McDonough offered to pay for the damage. Paulson said he did not want McDonough to pay for the window. The two conversed for a short time, Paulson offered McDonough a beer, and then they continued to talk about sports. The two exited the home, and Paulson asked, "[W]hat are we going to do about the window?" Paulson then went back inside, and McDonough followed, hoping he would not have to pay for the window. McDonough then asked to use Paulson's restroom, but, according to McDonough, Paulson refused and instead asked to watch McDonough urinate outside. Despite claiming that he felt like Paulson was propositioning him, McDonough stayed to finish his beer. Paulson again asked about the window, McDonough repeated his offer to pay, and Paulson told him he did not want money. Paulson put a hand on McDonough, who responded by hitting Paulson. McDonough tried to leave, Paulson grabbed him, and then McDonough knocked Paulson down and stabbed him. Evidence was introduced that McDonough

was abused physically and sexually as a child. He was also diagnosed as having posttraumatic stress disorder (PTSD) as a result of this abuse. McDonough now claims that Paulson triggered his PTSD by propositioning and touching him.

[¶10.]     On August 29, 2002, a Clay County Grand Jury indicted McDonough for second-degree murder in violation of SDCL 22-16-7 and SDCL 22-16-9 (repealed 2006). McDonough pleaded not guilty on August 30, 2002. McDonough's court-appointed defense counsel, Phil Peterson, retained a private investigator to explore the possibility of a self-defense claim. The investigator did not give Peterson a written report, but concluded that self-defense was not likely. Peterson also concluded that self-defense was not a viable claim because Paulson did not have a weapon within reach, McDonough had given several differing accounts of what occurred, McDonough had no defensive injuries to support his claim, McDonough had "cleaned up" the crime scene, and McDonough disposed of evidence immediately after stabbing Paulson. Nevertheless, Peterson testified that he intended to assert a claim of self-defense if the case had gone to trial.

[¶11.]     Due to his past experience, Peterson was convinced that the State was not likely to offer a favorable plea agreement if he attempted a suppression motion. The State did offer to dismiss the murder charge in exchange for McDonough pleading guilty to first-degree manslaughter. Given the mandatory life sentence that McDonough faced with a conviction of murder, and considering the weakness of McDonough's self-defense claim, Peterson recommended that McDonough accept the offer and plead guilty to first-degree manslaughter. Although Peterson also told McDonough about the possibility of getting a jury instruction on second-degree

manslaughter as a lesser-included offense to second-degree murder, McDonough appeared before the sentencing court on November 24, 2002, and pleaded guilty to violating SDCL 22-16-15(3) by committing manslaughter in the first degree. On April 14, 2003, the circuit court sentenced McDonough to imprisonment in the South Dakota State Penitentiary for a term of 85 years, but suspended the execution of 20 years according to certain terms and conditions.

[¶12.] McDonough did not directly appeal his sentence or the sentencing court's acceptance of his guilty plea. He now claims that he did not appeal because Peterson did not meet with him until after the time for appeal lapsed. While it is true that the log book Peterson kept for reimbursement purposes did not contain an entry for meeting with McDonough immediately after his sentencing, Peterson testified that he discussed the possibility of appealing the sentence with McDonough. Peterson also testified that he advised McDonough that he would need to request that the court appoint an attorney to represent him in his appeal. As Peterson pointed out, he was only appointed to serve as McDonough's defense counsel on the underlying charge. McDonough also received instruction on how to file an appeal at the sentencing hearing.

[¶13.] On August 30, 2013, the habeas court considered McDonough's amended application for writ of habeas corpus in a trial. The circuit court denied the entirety of McDonough's claims for habeas corpus relief and entered findings of fact and conclusions of law on November 1, 2013.

[¶14.] McDonough raises two issues in this appeal:

1. Whether the record clearly presented a factual basis sufficient to support McDonough's plea of guilty to the charge of manslaughter in the first degree.

2. Whether defense counsel was ineffective by not attempting to suppress statements McDonough made to law enforcement officers or by failing to properly advise McDonough of his appellate rights.

## Standard of Review

[¶15.] As we have often said, we limit our review of a habeas appeal "because it is a collateral attack on a final judgment." *Vanden Hoek v. Weber*, 2006 S.D. 102, ¶ 8, 724 N.W.2d 858, 861 (quoting *Crutchfield v. Weber*, 2005 S.D. 62, ¶ 8, 697 N.W.2d 756, 759) (internal quotation marks omitted). As such, "[h]abeas corpus can be used only to review (1) whether the court has jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases whether an incarcerated defendant has been deprived of basic constitutional rights." *Flute v. Class*, 1997 S.D. 10, ¶ 8, 559 N.W.2d 554, 556 (quoting *Weiker v. Solem*, 515 N.W.2d 827, 830 (S.D. 1994)). The petitioner must "prov[e] he is entitled to relief by a preponderance of the evidence." *Vanden Hoek*, 2006 S.D. 102, ¶ 8, 724 N.W.2d at 861-62. "We review habeas factual findings under the clearly erroneous standard and legal conclusions under the de novo standard." *Meinders v. Weber*, 2000 S.D. 2, ¶ 5, 604 N.W.2d 248, 252 (citing *Lodermeier v. Class*, 1996 S.D. 134, ¶ 3, 555 N.W.2d 618, 621-22).

[¶16.] "A claim of ineffective assistance of counsel presents a mixed question of law and fact." *Vanden Hoek*, 2006 S.D. 102, ¶ 9, 724 N.W.2d at 862 (citing *Boyles v. Weber*, 2004 S.D. 31, ¶ 7, 677 N.W.2d 531, 536). When raising an ineffective-assistance-of-counsel claim in habeas proceedings, a petitioner has the increased

burden of demonstrating "gross error by counsel in recommending that [he or she] plead guilty." *Coon v. Weber*, 2002 S.D. 48, ¶ 12, 644 N.W.2d 638, 643 (citing *Hofer v. Class*, 1998 S.D. 58, ¶ 11, 578 N.W.2d 583, 586).

## Analysis and Decision

1. *Whether the record clearly presented a factual basis sufficient to support McDonough's plea of guilty to the charge of manslaughter in the first degree.*

[¶17.] McDonough argues that the record did not present a clear factual basis sufficient to permit the sentencing court's acceptance of his guilty plea.[2] He claims

---

2. One of the issues McDonough raised in his initial habeas action was a claim that the circuit court did not advise him of his rights under *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), and that he did not knowingly, voluntarily, and intelligently enter his guilty plea. The habeas court rejected these claims, finding that McDonough was fully advised of all his statutory and constitutional rights at both his arraignment and change of plea hearing. McDonough did not raise these issues on appeal to this Court. Despite this waiver, McDonough repeatedly used the phrase "knowing, voluntary, and intelligent" in his brief and at oral argument. This use appears to derive from our decision in *State v. Nachtigall*, where we said the purpose of requiring the circuit court to establish a factual basis on the record is to "assure itself and this Court the guilty plea was voluntarily and intelligently entered." 2007 S.D. 109, ¶ 8, 741 N.W.2d 216, 220.

   In essence, McDonough's argument is as follows: establishing a factual basis on the record is a necessary condition of a voluntary and intelligent plea; the circuit court failed to establish a factual basis; therefore, McDonough did not knowingly and intelligently enter a guilty plea. However, while "[t]he factual basis requirements . . . were designed to . . . ensur[e] that a guilty plea is entered voluntarily and intelligently[,]" *id.* (quoting *State v. Shulz*, 409 N.W.2d 655, 658 (S.D. 1987)) (internal quotation marks omitted), establishing a factual basis is not necessarily synonymous with a knowingly and intelligently entered plea. The former focuses on the court; the latter, the defendant.

   Thus, we view McDonough's argument that he did not voluntarily and intelligently enter his plea to mean simply that the circuit court failed to establish a factual basis sufficient to support McDonough's plea. We note,

(continued . . .)

the record was deficient in two ways. First, McDonough argues the sentencing court did not have a proper factual basis to accept his plea because he maintained that he acted in self-defense. In essence, McDonough argues that admitting all elements of a crime while contemporaneously asserting a possible defense is functionally equivalent to pleading guilty while denying an essential element of the crime. Second, McDonough simply argues nothing in the record of his arraignment or change of plea hearing established that Paulson had actually died. Because a death is a necessary element of the crime of manslaughter, McDonough concludes the sentencing court did not have a proper factual basis to accept his plea.

[¶18.] In the initial habeas proceedings, McDonough first raised these arguments as a part of his ineffective-assistance-of-counsel claim. Now, on appeal from the habeas court's decision, he asks us to consider them both as an independent ground for relief *and* as a reason to conclude that he was deprived of his right to counsel during his criminal prosecution. Although we may view the denial of a petitioner's basic constitutional rights in a criminal case to be a matter of jurisdictional error, *Flute*, 1997 S.D. 10, ¶ 8, 559 N.W.2d at 556 (quoting *Weiker*, 515 N.W.2d at 830), we have long held that "[h]abeas corpus cannot be utilized as a substitute for an appeal[,]" *State ex rel. Smith v. Jameson*, 70 S.D. 503, 507, 19 N.W.2d 505, 507 (1945) (citing *Knewel v. Egan*, 268 U.S. 442, 447, 45 S. Ct. 522, 525, 69 L. Ed. 1036 (1925)). However, even if we assume that this is not an attempt

---

(. . . continued)
   however, that even if McDonough's argument on appeal were interpreted to mean that the circuit court was required to canvass him on potential affirmative defenses, we recently rejected this notion in *Legrand v. Weber*, 2014 S.D. 71, ¶¶ 11-26, 855 N.W.2d 121, 126-29.

to use habeas corpus in place of a proper appeal, we have previously said, "[T]he failure of a trial court to establish a factual basis does not reach the constitutional or jurisdictional proportions necessary to bring the question within the scope of habeas corpus." *Lien v. Class*, 1998 S.D. 7, ¶ 7 n.6, 574 N.W.2d 601, 606 n.6 (citing *Petrilli v. Leapley*, 491 N.W.2d 79, 82 (S.D. 1992)). Whatever the term "certain cases" might encompass, *see Flute*, 1997 S.D. 10, ¶ 8, 559 N.W.2d at 556 (quoting *Weiker*, 515 N.W.2d at 830), a court's failure to establish a clear factual basis on the record does not constitute a violation of a petitioner's basic constitutional rights.

[¶19.]     In *Petrilli*, for example, the petitioner sought habeas relief to avoid a habitual offender charge in South Dakota by collaterally attacking a prior conviction from California. 491 N.W.2d at 81. Petrilli, who was represented by counsel, pleaded guilty in California as part of a plea agreement. *Id.* In the habeas proceeding, Petrilli did not argue there was *no* factual basis for his plea, but rather that the California court did not comply with SDCL 23A-7-2 because it failed to clearly identify the factual basis for accepting the plea on the record. *Id.* at 83 n.2. Despite the fact that the California court did not inquire into the factual basis at all, this Court denied the petitioner habeas relief. *Id.* at 86. We noted that the United States Supreme Court previously held, "[A] conviction based on a guilty plea is not subject to collateral attack under the federal habeas corpus act solely on the basis that a formal violation of Rule 11 occurred, such violation being neither constitutional nor jurisdictional." *Id.* at 83 n.2 (citing *United States v. Timmreck*, 441 U.S. 780, 783-84, 99 S. Ct. 2085, 2087, 60 L. Ed. 2d 634 (1979)). Similarly, we

concluded that Petrilli's "only claim is a violation of SDCL 23A-7-2, which could have been raised on direct appeal." *Id.*

[¶20.] The case now before us is not materially distinguishable from *Petrilli*. Although McDonough argues that his admission of the elements of first-degree manslaughter was called into question by his contemporaneous assertion of self-defense, and that the record did not contain evidence that Paulson had expired, both arguments amount to no more than an assertion that the sentencing court acted contrary to SDCL 23A-7-2 in accepting his guilty plea.[3] Even if we were

---

3. An argument could be made that, while Petrilli unequivocally pleaded guilty in the California case, McDonough equivocated by pleading guilty while raising a possible defense. It is true that we have previously held that "[w]hen a homicide defendant raises self-defense or justification, the State must prove beyond a reasonable doubt that the killing was without authority of law." *State v. Pelligrino*, 1998 S.D. 39, ¶ 19, 577 N.W.2d 590, 598 (citing *Francis v. Franklin*, 471 U.S. 307, 314, 105 S. Ct. 1965, 1971, 85 L. Ed. 2d 344, 353 (1985)). In the context of SDCL 23A-7-2, the argument would urge adding the *absence* of self-defense as an element to homicide. Thus, the argument would go, a plea that includes an uncontroverted assertion of an affirmative defense would not provide an adequate factual basis upon which to accept a guilty plea.

   However, the United States Supreme Court has held, "The Due Process Clause does not mandate that when a State treats absence of an affirmative defense as an 'element' of the crime for one purpose, it must do so for all purposes." *Engle v. Isaac*, 456 U.S. 107, 120, 102 S. Ct. 1558, 1568, 71 L. Ed. 2d 783 (1982). Even if the State has the burden of proving the absence of an affirmative defense at trial, we see no reason to treat the absence of an affirmative defense as an element of homicide for purposes of establishing a factual basis for a guilty plea. The primary reason for this is that a court, in accepting a plea under SDCL 23A-7-2, must only "be satisfied there is a factual basis for the plea, and not necessarily that the defendant is guilty." *State v. Shulz*, 409 N.W.2d 655, 659 (S.D. 1987). The distinction between equivocation by denial and equivocation by raising a possible defense is crucial. While the former involves the denial of an element of the charged crime, the latter involves an unequivocal admission of all elements of the charged crime. The result, in this case, is that McDonough, like Petrilli,

(continued . . .)

convinced that the sentencing court so erred, no claim could "reasonably be made that the error here resulted in a 'complete miscarriage of justice' or in a proceeding 'inconsistent with the rudimentary demands of fair procedure.'" *Timmreck*, 441 U.S. at 784, 99 S. Ct. at 2087 (quoting *Hill v. United States*, 368 U.S. 424, 428, 82 S. Ct. 468, 471, 7 L. Ed. 2d 417 (1962)). McDonough should have challenged such a formalistic statutory violation by direct appeal, rather than in a habeas appeal. Because the "finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas[,]" *id.* (footnote omitted), we will not now permit McDonough's "collateral attack to do service for an appeal." *Petrilli*, 491 N.W.2d at 83 n.2 (quoting *Timmreck*, 441 U.S. at 783-84, 99 S. Ct. at 2087) (internal quotation marks omitted).

> 2. *Whether defense counsel was ineffective by not attempting to suppress statements McDonough made to law enforcement officers or by failing to properly advise McDonough of his appellate rights.*

[¶21.] McDonough also argues that he received ineffective assistance of counsel. He claims that Peterson's representation was ineffective in two ways. First, McDonough claims Peterson should have attempted to suppress statements that McDonough made during his recorded interview with Deputy Howe on August 16, 2002. Second, McDonough claims Peterson did not properly advise him of his appellate rights in regard to either the sentencing court's acceptance of his guilty plea or his subsequent sentence. The United States Supreme Court explained the test for determining whether a defendant received ineffective assistance of counsel

---

(. . . continued)
    admitted the essential elements of the crime for which he was charged and does not dispute that basis.

in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires the petitioner to prove that his or her attorney performed deficiently and that he or she was prejudiced by the deficient performance. *Id.* at 687, 104 S. Ct. at 2064; *State v. Thomas*, 2011 S.D. 15, ¶ 21, 796 N.W.2d 706, 713 (citing *Steichen v. Weber*, 2009 S.D. 4, ¶ 24, 760 N.W.2d 381, 392). We employ the same standard. *Luna v. Solem*, 411 N.W.2d 656, 658 (S.D. 1987).

[¶22.] In order to succeed on a claim of ineffective assistance of counsel, a petitioner must first establish that "counsel's performance was deficient." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. The petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S. Ct. at 2064; *accord Thomas*, 2011 S.D. 15, ¶ 21, 796 N.W.2d at 713 (citing *Dillon v. Weber*, 2007 S.D. 81, ¶ 7, 737 N.W.2d 420, 424). This standard "remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065. In determining whether counsel met this standard, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Owens v. Russell*, 2007 S.D. 3, ¶ 8, 726 N.W.2d 610, 615 (quoting *Hofer*, 1998 S.D. 58, ¶ 10, 578 N.W.2d at 585-86).

[¶23.] Even if counsel failed to perform within prevailing professional norms, a petitioner must still show that he or she was prejudiced as a result of counsel's deficient performance. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error

had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. In the context of a plea, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985) (footnote omitted).

> a. *Whether defense counsel was ineffective by not attempting to suppress statements McDonough made to Deputy Howe.*

[¶24.] Applying the foregoing, then, McDonough would normally have to show that Peterson's performance fell short of prevailing professional norms. Because this case involves a plea agreement and, consequently, the case did not proceed to trial, McDonough must instead show that Peterson committed gross error—i.e., that Peterson's performance fell exceedingly short of prevailing professional norms. *See Coon*, 2002 S.D. 48, ¶ 12, 644 N.W.2d at 643. Additionally, "our review of counsel's performance is highly deferential. We start with the strong presumption that counsel's conduct falls within the range of reasonable professional assistance. We view the actions in light of the past circumstances and information, not with the benefit of hind-sight." *Owens,* 2007 S.D. 3, ¶ 13, 726 N.W.2d at 616 (citations omitted).

> i. *Whether Peterson should have attempted suppression of the statements because McDonough was in custody.*

[¶25.] McDonough's suppression argument faces a number of obstacles, not the least of which is its dependency on convincing us that he was in custody when he made the incriminating statements. As we previously explained, "*Miranda*

warnings are required only when there is a custodial interrogation." *State v. Wright*, 2009 S.D. 51, ¶ 19, 768 N.W.2d 512, 520 (citing *State v. Aesoph*, 2002 S.D. 71, ¶ 17, 647 N.W.2d 743, 751).

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'

*State v. Thompson*, 1997 S.D. 15, ¶ 23, 560 N.W.2d 535, 540 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714, 719 (1977)). We use a two-part test to determine whether an interview was custodial. "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Wright*, 2009 S.D. 51, ¶ 19, 768 N.W.2d at 520 (alteration in original) (citing *State v. Johnson*, 2007 S.D. 86, ¶ 22, 739 N.W.2d 1, 9). The test we apply is an objective one. *Id.*

[¶26.]     Detective Oswald requested that McDonough accompany him to the Center. Reluctant as McDonough's assent might have been, it was still freely given. Detective Oswald wore plain clothes and drove an unmarked police car. McDonough sat in the front seat, unrestrained. At the Center, Deputy Howe immediately told McDonough—prior to questioning—that he was free to leave at any time and thanked McDonough for coming to the Center. Deputy Howe also repeatedly assured McDonough that he would be returned to his home at the

conclusion of the interview. When McDonough asked Deputy Howe if he could leave at one point during the interview, Deputy Howe told him that it would not be to his benefit. As the habeas court noted, Deputy Howe did not tell him that he was no longer free to leave. It seems clear that McDonough remained because he understood that law enforcement might pursue a warrant against him at a later date. This does not support the conclusion that McDonough was unable to leave. Rather, it seems indicative of an individual making a calculated choice regarding the costs and benefits of early cooperation with law enforcement and freely choosing to submit to an interview. Given the circumstances, we conclude that a reasonable person would have felt at liberty to terminate the interview and, consequently, McDonough was not in custody.

[¶27.] McDonough faces other insurmountable obstacles to his habeas appeal as well. Even if we were to conclude that he was in custody during the first interview with Deputy Howe, there are several sets of statements at issue: the statements made prior to receiving a *Miranda* warning, the written statement immediately following the *Miranda* warning, statements made at the time of McDonough's arrest, and the post-arrest statements made the following day. In claiming that Peterson's assistance was ineffective, McDonough appears to rely on the "fruit of the poisonous tree" doctrine to assume that all of his statements would have been suppressed if Peterson had been successful in suppressing the pre-*Miranda*-warning statements. However, McDonough does no more than suggest that "[h]ad Peterson challenged the statements and been successful McDonough would have had a very strong self-defense case." Simply describing what would

have happened if the doctrine had been applied ignores the antecedent question of whether or not application of the doctrine was likely. The question is not what result would occur if Peterson had been successful. The question, rather, is whether the potential gain considered *in conjunction with* the potential for success outweighs the likely detriment. If the doctrine would not apply in this case, then Peterson can hardly be said to have committed gross error in not attempting suppression.

[¶28.] Without application of the "fruit of the poisonous tree" doctrine, McDonough offers little in the way of argument for suppressing his post-*Miranda*-warning statements. It is true that the United States Supreme Court later held the type of two-phase interview technique that Deputy Howe employed against McDonough to be a violation of *Miranda*. *See Missouri v. Seibert*, 542 U.S. 600, 617, 124 S. Ct. 2601, 2613, 159 L. Ed. 2d 643 (2004) (holding that "the [technique of interrogating in successive, unwarned and warned phases] effectively threatens to thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted[,]" and suppressing statements given after such questioning when the facts did not "reasonably support a conclusion that the warnings given could have served their purpose"). However, the *Seibert* holding cannot now be used to impugn the quality of Peterson's representation of McDonough, which occurred two years prior to that decision. Even if it could, McDonough has not asserted that the warning given by Deputy Howe failed to properly inform him of his rights and the dangers of his continued cooperation with law enforcement. Without such an assertion, McDonough cannot show that the pre-warning interview tainted the post-

warning statements, especially those statements made later that day at the time of arrest or during custodial interviews on the following day. In other words, McDonough has not shown that duplicate confessions would have been excluded along with the pre-*Miranda*-warning statements. Consequently, McDonough cannot show that Peterson grossly erred in deciding not to place a potential plea agreement in jeopardy by moving to suppress McDonough's statements.

> ii. *Whether Peterson should have attempted suppression because McDonough's confession was involuntary.*

[¶29.] McDonough additionally argues that, even if he was not in custody when Deputy Howe initially interviewed him, his statements were coerced and, therefore, not voluntary. McDonough claims—and the State does not contradict— that the State must show by a preponderance that his confession was voluntary. Therefore we assume, without deciding, this is the appropriate standard. In determining whether a confession was voluntary, "[t]he factual inquiry centers on (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure." *Wright*, 2004 S.D. 50, ¶ 6, 679 N.W.2d at 468 (alteration in original) (quoting *State v. Tuttle*, 2002 S.D. 94, ¶ 22, 650 N.W.2d 20, 31) (internal quotation marks omitted). We consider the totality of the circumstances in gauging the suspect's capacity to resist pressure created by law enforcement. *Id.* This includes:

> the defendant's age; level of education and intelligence; the presence or absence of any advice to the defendant on constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of psychological pressure or physical punishment, such as deprivation of food or sleep; and the defendant's prior experience with law enforcement officers and the courts. Further, while law enforcement interrogation may utilize psychological tactics, the

> trial court may consider law enforcement's deceptions and misrepresentations in its determination of the voluntariness of admissions.

*Id.* (citations omitted).

[¶30.] We first consider Deputy Howe's conduct. McDonough claims that his statements to Deputy Howe were involuntary because the Deputy told him that he would only get a sentence of 10 to 20 years in prison if he confessed and that some defendants get as little as two years for homicides. McDonough further claims that Deputy Howe lied about the volume of evidence against him. However, we have previously noted that "deception by the police is not sufficient to make an otherwise valid confession inadmissible unless it appears that the deception produced a coerced or involuntary confession." *State v. Owens*, 2002 S.D. 42, ¶ 53, 643 N.W.2d 735, 750 (citing *State v. Frazier*, 2001 S.D. 19, ¶ 20, 622 N.W.2d 246, 255). While it is true that Deputy Howe discussed several scenarios in which other defendants received shorter sentences than McDonough received, Deputy Howe repeatedly stressed that it was not his decision and that he could not make any promises regarding the length of sentence that McDonough would actually receive. Deputy Howe did not appear overly aggressive in the interview and generally asked open-ended questions. Overall, the interview was relaxed.

[¶31.] Next, we consider McDonough's capacity to resist pressure. McDonough was 20 years of age when interviewed by Deputy Howe. He had a high school diploma and otherwise appeared to be of ordinary intelligence. The habeas court noted that there was no evidence that McDonough was under the influence of any mind-altering substances or sleep deprivation at the time of the interview. The

questioning lasted between one and one and one-half hours and occurred during the middle of the day. Deputy Howe did not initially read a *Miranda* warning to McDonough, but after he had done so, McDonough continued to cooperate. When McDonough asked whether he should have an attorney, Deputy Howe told him that it was his decision to make. Finally, we note that the sentencing court considered several violent incidents in McDonough's past for purposes of sentencing. One of those incidents is particularly relevant for purposes of gauging McDonough's experience with law enforcement. In April 2001, barely more than a year before he killed Paulson, law enforcement officers arrested McDonough in Redwing, Minnesota, for beating his sister, who was nine-months pregnant and holding her three-year-old child at the time of the assault. After a law enforcement officer read McDonough a *Miranda* warning, McDonough refused to make a statement and only wanted an explanation of the charges he faced.

[¶32.] Considering the totality of the circumstances, the facts of this case lead us to conclude that any pressure Deputy Howe created toward McDonough fell well within the limits of acceptable law enforcement interview tactics. Given the circumstances of the interview and McDonough's demonstrated ability to resist the questioning of law enforcement officers during prior encounters, we also conclude that McDonough was adequately equipped to resist whatever pressure that Deputy Howe actually did create. It is clear that McDonough's will was not overborne. We conclude that McDonough's statements were voluntary; consequently, Peterson was not required to attempt suppression on this basis.

       iii.    *Whether counsel was ineffective because McDonough had a viable defense.*

[¶33.] McDonough also claims that Peterson failed to attempt to suppress statements made to Deputy Howe because Peterson "focused on the State's case rather than [McDonough's] case" and "decided not to develop any defense at all." Yet, the habeas court recognized a number of facts supporting a contrary conclusion. Peterson retained a private investigator for the specific purpose of developing a defense theory. The investigator, as well as Peterson, came to the conclusion that a claim of self-defense was not likely to succeed at trial. Peterson was mindful of the facts that Paulson had no weapon during his encounter with McDonough and that McDonough made subsequent statements that were likely admissible. Peterson was also aware that McDonough never alerted the authorities after he stabbed Paulson, even though he took Paulson's pulse and knew that he was still alive immediately after the stabbing. Instead, McDonough attempted to "clean up" the crime scene by throwing away beer cans and hiding the weapon. He also attempted to thwart investigation by later disposing of the shoes he wore during the stabbing. McDonough had no injuries or other evidence to corroborate his claim that Paulson was the aggressor. And, perhaps most important of all, Peterson was aware of the credibility issue McDonough faced as the result of telling several different versions of the killing. While most of these factors are, of course, components of the State's case, many also militate against raising a claim of self-defense when doing so might jeopardize the availability of a plea bargain. We see no reason to conclude that any of these factual findings are clearly erroneous and, based on the same, likewise conclude that Peterson did not commit gross error in deciding that a claim of self-defense was not likely to succeed at trial.

[¶34.]     Peterson's assessment of the relative strengths and weaknesses of the State's case and McDonough's self-defense claim set the stage for Peterson's decision not to pursue the suppression of McDonough's statements. The habeas court found that Peterson believed that filing a suppression motion was not likely to benefit McDonough because there were multiple statements that would survive suppression and there was independent evidence linking McDonough to the killing. Further, Peterson believed—based on past experience—the State would not likely offer a favorable plea agreement if he filed a motion to suppress. Again, we see no reason to conclude that any of these factual findings are clearly erroneous, or to deviate from our presumption that Peterson rendered reasonable professional assistance to McDonough, let alone that he committed gross error.

[¶35.]     Because we conclude that Peterson's assistance to McDonough did not fall substantially short of the range of reasonable professional assistance expected of an attorney, it is not necessary to consider whether McDonough, but for Peterson's actions, would have insisted on going to trial. Even if we were to conclude otherwise, the preceding discussion demonstrates that McDonough would not be able to meet his burden of proving prejudice. Because McDonough was not likely to get all of his confessions suppressed, the State probably would have been left with ample evidence for a viable prosecution. Given the relative weakness of McDonough's self-defense claim, it seems that McDonough would have found himself in the same position, at best. At worst, he may have actually had to proceed to trial for lack of a plea opportunity and face a mandatory sentence of life imprisonment.

> b. *Whether defense counsel was ineffective in not appealing McDonough's sentence.*

[¶36.]     As in the preceding section, we once again begin with a strong presumption that counsel's chosen course of action fell within the range of reasonable professional assistance. *Owens*, 2007 S.D. 3, ¶ 8, 726 N.W.2d at 615 (quoting *Hofer*, 1998 S.D. 58, ¶ 10, 578 N.W.2d at 585-86). McDonough must establish that Peterson prejudiced him by committing gross error. McDonough argues that Peterson failed to properly inform him of his right to appeal or to pursue an appeal on his behalf. He also argues that, had he timely exercised his right to appeal, he was likely to succeed in challenging the factual basis for the sentencing court's acceptance of his guilty plea, as well as the voluntariness of his statements. Because we conclude that McDonough was not prejudiced as a result of his failure to timely appeal, we need not address whether Peterson substantially deviated from professional norms.

> i. *Whether McDonough was likely to succeed in appealing the factual basis of his guilty plea.*

[¶37.]     McDonough first argues that he was likely to succeed in appealing the sentencing court's acceptance of his guilty plea. Specifically, McDonough argues that his assertion of a possible affirmative defense, contemporaneous with his plea, deprived the sentencing court of a factual basis upon which to accept the plea. He also argues the record did not clearly establish that a homicide had occurred. "Our standard of review in a challenge to the adequacy of the factual basis for accepting a guilty plea is well settled." *State v. Nachtigall*, 2007 S.D. 109, ¶ 5, 741 N.W.2d 216, 219. "Before accepting a guilty plea, a court must be subjectively satisfied that a factual basis exists for the plea. The court must find a factual basis for each

element of the offense. The factual basis must appear clearly on the record." *State v. Schulz*, 409 N.W.2d 655, 658 (S.D. 1987) (citations omitted).

[¶38.] In this case, the record clearly exhibits an adequate factual basis to support McDonough's plea. The sentencing court clearly described the elements of first-degree manslaughter to McDonough. The court asked McDonough if he understood the charge and invited him to ask questions regarding that charge. McDonough indicated that he understood, declined the opportunity to ask questions, and pleaded guilty in order to receive the benefit of a plea agreement. As we noted in footnote two, there is a material distinction between a defendant who fails or refuses to admit an essential element of the charge and one who admits all essential elements of the charge but contemporaneously claims a justification or excuse for his or her act. A defendant who admits all essential elements of a charge provides the necessary factual basis to accept a plea, even if his or her contemporaneous assertion of a justification or excuse might actually result in a trial verdict of not guilty.

[¶39.] The record also contained other evidence of a homicide. "It is not necessary that a defendant state the factual basis in his own words." *Id.* at 658 (citing *United States v. Lovelace*, 683 F.2d 248, 251 (7th Cir. 1982)). Instead, "the court may find the factual basis in anything that appears on the record." *See id.* (noting that SDCL 23A-7-2 is closely patterned after Federal Rule of Criminal Procedure 11(f), which does not require a colloquy between judge and defendant). Thus, a "court may inquire of the prosecution or the law enforcement officer who investigated the case. The court may look to a defendant's own admissions, the

government's proffer of evidence or the pre-sentence report[.]" *Id.* (citation omitted). A court may even find a factual basis when "the defendant cannot or will not admit to the facts establishing the elements of the crime[.]" *Nachtigall*, 2007 S.D. 109, ¶ 5, 741 N.W.2d at 219 (quoting *Gregory v. State*, 325 N.W.2d 297, 299 (S.D.1982)). McDonough claims that there was no evidence of a homicide on the record, yet he admitted to having committed one at his change of plea hearing. When the court asked McDonough to describe what occurred, he said, in part, "Then the knife was on the floor and I grabbed it and I stabbed [Paulson] with it." McDonough clearly established that he committed the act that set Paulson's death in motion. Further, the State introduced information gathered from Paulson's autopsy. Because autopsies typically are only performed on the deceased, we are eminently confident that the sentencing court was subjectively satisfied that a factual basis existed for the homicide element of first-degree manslaughter. Thus, McDonough has not convinced us that he was likely to succeed in an appeal on the grounds that the sentencing court did not have an adequate factual basis upon which to accept his guilty plea.

> ii.      *Whether McDonough was likely to succeed in appealing the voluntariness of his confessions.*

[¶40.]      Because we hold that McDonough's statements were made voluntarily, we also hold that McDonough was not likely to succeed in appealing the voluntariness of those statements. As a result, McDonough was not prejudiced.

## Conclusion

[¶41.]      We conclude that Peterson's decision to forgo a motion to suppress statements McDonough made to law enforcement officers was not gross error

because Peterson had sound legal reasons for that choice.  Because McDonough's appeal would have been almost entirely meritless, we also conclude that he was not prejudiced by missing the opportunity to appeal his sentence or the circuit court's acceptance of his guilty plea.  Accordingly, we affirm.

[¶42.]     KONENKAMP, ZINTER, SEVERSON, and WILBUR, Justices, concur.

[¶43.]     KERN, Justice, not having been a member of the Court at the time this action was assigned to the Court, did not participate.