#27292, #27404-a-DG

**2016 S.D. 8**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

CHRISTOPHER CHIPPS,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE WARREN G. JOHNSON
Retired Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

GRANT FLYNN
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.


DAVID L. CLAGGETT
Claggett & Dill, Prof. LLC
Spearfish, South Dakota                 Attorneys for defendant
                                        and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS ON
NOVEMBER 30, 2015

OPINION FILED **01/27/16**

GILBERTSON, Chief Justice

[¶1.]        A jury convicted Christopher Lee Chipps of one count of second-degree burglary and four counts of identity theft.  Facing a second trial for additional criminal activity, Chipps pleaded guilty to one count of grand theft.  He now appeals his jury convictions and sentences imposed for each of the foregoing crimes.  Chipps asserts that he did not receive effective assistance of counsel, that his sentences are cruel and unusual, and that there was insufficient evidence to sustain his convictions.  We affirm.

**Facts and Procedural History**

[¶2.]        David and Charlotte Crisp shared a home as husband and wife in Whitewood, South Dakota.  Charlotte was diagnosed with leukemia in 2008 and took several different medications to treat her illness and manage her pain, including Lorazepam, a controlled substance.[1]  On April 25, 2014, shortly after 7:30 p.m., the Crisps were watching television in their bedroom when Charlotte thought she heard a vehicle in their driveway.  David investigated but did not see anyone outside.

[¶3.]        Around 8:00 p.m., Charlotte asked David to bring her one of her medications from their dining room.  David discovered that Charlotte's purse, their cell phones, a bottle of Lorazepam, and Charlotte's experimental cancer medications were missing.[2]  Further investigation revealed the basement lights were on, the

---

1.      Charlotte lost her battle with leukemia on July 30, 2014.

2.      David testified that a bottle of 20 of these experimental pills costs over
        $4,400.  Eight of these pills were taken in the burglary.

-1-

basement door was open, several of David's tools and a work jacket were missing, and the dome light in his vehicle was on. David contacted law enforcement.

[¶4.] Lawrence County Sheriff's Deputy Patrick Johnson was dispatched to the Crisps' residence at 8:07 p.m. and arrived within 10 minutes. Deputy Johnson walked through the home and took pictures. Charlotte accessed her bank account online. While Deputy Johnson and Charlotte were discussing the need to cancel her credit and debit cards, unauthorized charges began appearing on her account. One transaction occurred at 8:13 p.m. at Sonset Gas Station, which is located one to one-and-one-half miles from the Crisps' home. Three more transactions occurred at the Walmart in neighboring Spearfish between 8:36 and 8:45 p.m. Deputy Johnson contacted Detective Tavis Little of the Lawrence County Sheriff's Office and alerted him of the possible criminal activity.

[¶5.] After speaking with Deputy Johnson, Detective Little immediately traveled to the Spearfish Walmart in order to obtain any available evidence. Walmart employees provided Detective Little with a video recording of the individual who had used Charlotte's card. The recording showed a slender male with short, dark hair and a tattoo on the left side of his neck. The man wore a work jacket like the one David had noticed was missing from his home. The time stamps on the recording corresponded to the time stamps on the receipts from the three transactions involving Charlotte's card.

[¶6.] After leaving Walmart, Detective Little contacted Sergeant Barff of the Sturgis Police Department. Detective Little described the appearance of both the individual he witnessed in the Walmart recording and the individual's vehicle.

Sergeant Barff told Detective Little that Chipps matched the given description. Additionally, Detective Little learned that Chipps was known by the Sturgis Police Department to drive a white Dodge Stratus.[3]

[¶7.]      Three days later, Detective Little also obtained a video recording from Sonset's manager showing the individual who had used Charlotte's card at the station. The recording showed a slender male with short, black hair—like the individual shown in the Walmart recording—enter Sonset at 8:02 p.m. After leaving the store, the same individual later returned in a white Dodge sedan, the same style of vehicle that Detective Little associated with the individual he saw in the Walmart recording. A portion of the vehicle's license plate was legible. After exiting the vehicle, the individual put on a work jacket of the same style worn by the individual shown in the Walmart recording. After several attempts, the individual successfully used Charlotte's card to pay for fuel. As with the Walmart transactions, the time stamps on the Sonset recording corresponded to the time stamps on the receipts involving Charlotte's card.

[¶8.]      On April 30, Detective Little uncovered additional evidence. After searching for Chipps's name in an online registry of pawn-shop transactions, Detective Little learned that Chipps had pawned a gold ring at First National Pawn in Rapid City. The ring closely matched the description of a ring Charlotte reported missing after the burglary. Detective Little also learned that Chipps had pawned a pendant. After seeing pictures of the pawned jewelry, Charlotte confirmed they belonged to her. Although the pawn shop was unable to make a copy of its video

---

3.      The vehicle actually belonged to Chipps's girlfriend.

recording, Detective Little was able to view the recording of the transaction in which Chipps sold Charlotte's ring.

[¶9.]     Later that day, Detective Little travelled to Chipps's girlfriend's home in Blackhawk.  Upon arriving, Detective Little noticed that the vehicle parked at the residence was the same vehicle he had observed in the Walmart and Sonset recordings.  The vehicle's license plate matched the portion of the license plate visible in the video recordings.  Chipps was present in the home, and Detective Little recognized him as the individual shown in the recordings from Walmart, Sonset, and First National Pawn.  Chipps had a tattoo in the same spot as the individual shown in the recordings.  Meade County sheriff's deputies arrested Chipps, and Detective Little recovered Charlotte's cell phone from the residence.

[¶10.]     On April 18, 2014—one week before Chipps burglarized the Crisps' home—Chipps had interviewed for potential employment with Justin Sherwood.  Shortly after the interview, Sherwood noticed that the keys to his vehicle were missing.  Sherwood reported the vehicle missing on June 26.  The next day—and after Chipps had been released on bond pending trial for the events surrounding the Crisp burglary—Sturgis Police Officer Tyrone Lee noticed a vehicle matching the description of the one Sherwood reported stolen.  As Officer Lee approached the vehicle, Chipps stepped out of the driver's door.  A check of the vehicle's identification number revealed that the vehicle was in fact the one reported stolen by Sherwood.  Meade County law enforcement took Chipps into custody for a second time.

[¶11.]     Chipps was indicted in Lawrence County on May 22, 2014, with one count of second-degree burglary in violation of SDCL 22-32-3, one count of grand theft (more than $2,500 but less than $5,000) in violation of SDCL 22-30A-1 and -17, one count of obtaining possession of a controlled substance by theft in violation of SDCL 22-42-8, and four counts of identity theft in violation of SDCL 22-40-8. The State also filed a habitual-criminal information alleging Chipps had previously been convicted of two felonies. On July 9, before trial had commenced in Lawrence County, Chipps was indicted in Meade County with one count of grand theft in violation of SDCL 22-30A-1, -7, and -17 and possession of marijuana (two ounces or less) in violation of SDCL 22-42-6. The State also filed a habitual-criminal information with the Meade County indictment.

[¶12.]     After Chipps was indicted in Lawrence County, his attorney at the time arranged for him to undergo a forensic psychological evaluation for the purpose of determining whether Chipps fit the statutory definition of "mentally ill" at the time of the alleged crimes. Dewey J. Ertz, Ed. D., conducted the evaluation and issued a report on July 21, 2014. The report stated:

> It is my opinion that [Chipps] meets the current definition of mental illness described in South Dakota law. He has substantial psychiatric disorders which involve thought, mood, and behavior. These disorders were present during the commission of the alleged crimes noted above and frequently impair [his] judgment. His impairments did not prevent him from knowing the wrongfulness of his acts and they are presented in various ways and various settings beyond repeated criminal behavior or antisocial conduct. This opinion is stated within a reasonable degree of psychological certainty.

Dr. Ertz recommended that "[l]ong-term supervision and constraints on [Chipps's] activities represent the most effective way of assisting [Chipps] to reduce the

potential to be harmful to himself and to protect others from [Chipps] becoming harmful to them."

[¶13.]    On September 18, 2014, after a two-day trial, a jury convicted Chipps of second-degree burglary and all four counts of identity theft. Chipps did not present a mental-illness defense. Chipps admitted to prior convictions for grand theft in 2002 (Class 4 felony) and possession of a controlled substance in 2005 (Class 4 felony). The Lawrence County court sentenced Chipps to 20 years imprisonment for the burglary conviction and 5 years for each identity-theft conviction. Although each identity-theft sentence runs concurrently with the others, they run consecutively with the burglary sentence. Chipps filed a notice of appeal regarding these convictions and sentences on December 19.

[¶14.]    On the same day that Chipps filed his first appeal, he underwent a forensic psychiatric evaluation by Stephen Manlove, M.D. Dr. Manlove concluded: "It is my opinion with reasonable medical certainty that [Chipps] was mentally ill at the time of the crimes he has been convicted of." Based on this and Dr. Ertz's earlier report, Chipps pleaded guilty but mentally ill on January 29, 2015, to the grand theft charged in the Meade County indictment. Under a plea agreement, the State dismissed the remaining charges as well as the habitual-criminal information. Chipps was sentenced to eight years imprisonment, with two years suspended, and fined $10,000. This sentence runs consecutively with the Lawrence County sentences. Chipps filed a notice of appeal regarding this sentence on March 19.

[¶15.]    In this consolidated appeal, Chipps raises three issues:

> 1.    Whether the assistance rendered by Chipps's trial attorney was so ineffective that reversal on direct appeal is warranted.

2. Whether Chipps's sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment.

3. Whether the circuit court erred by denying Chipps's motion for judgment of acquittal.

## Analysis and Decision

[¶16.] **1. *Whether the assistance rendered by Chipps's trial attorney was so ineffective that reversal on direct appeal is warranted.***

[¶17.] Chipps asserts that the assistance he received from his trial counsel was ineffective. To prevail on an ineffective-assistance-of-counsel claim, "the defendant must show that . . . counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); *McDonough v. Weber*, 2015 S.D. 1, ¶ 21, 859 N.W.2d 26, 37. In order to meet this burden, Chipps must establish that his counsel's performance was not objectively reasonable under prevailing professional standards, *McDonough*, 2015 S.D. 1, ¶ 22, 859 N.W.2d at 37 (citing *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065), and that absent the deficient performance, "there is a reasonable probability that . . . the result of the proceeding would have been different[,]" *State v. Craig*, 2014 S.D. 43, ¶ 38, 850 N.W.2d 828, 838 (quoting *Dillon v. Weber*, 2007 S.D. 81, ¶ 8, 737 N.W.2d 420, 424). However, there is a strong "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *McDonough*, 2015 S.D. 1, ¶ 22, 859 N.W.2d at 37 (quoting *Owens v. Russell*, 2007 S.D. 3, ¶ 8, 726 N.W.2d 610, 615). Reviewing an ineffective-assistance-of-counsel claim on direct appeal does not

permit an "attorney[] charged with ineffectiveness to explain or defend [his or her] actions and strategies[.]" *State v. Thomas*, 2011 S.D. 15, ¶ 23, 796 N.W.2d 706, 714 (quoting *State v. Arabie*, 2003 S.D. 57, ¶ 20, 663 N.W.2d 250, 256). Therefore, this Court will not grant relief for such a claim on direct appeal unless it is obvious on the record that the defendant has been deprived of his constitutional rights to counsel and a fair trial.

[¶18.] Chipps asserts his counsel was ineffective in the following ways: (1) by not attempting to prevent statements and testimony relating to Charlotte's illness and passing; (2) by not objecting to various points of Detective Little's testimony; (3) by not objecting to alleged prosecutorial misconduct in the State's opening and closing arguments; (4) by making damaging admissions during closing argument; (5) by failing to call any witnesses to refute the State's assertion that Chipps was motivated by a need for money; (6) by failing to argue that Chipps's mental illness precluded specific intent; (7) by failing to submit a special verdict form of "guilty but mentally ill"; and (8) by failing to object to Chipps's sentences in either county. Thus, Chipps's assertions may be divided into two broad categories: (1) trial counsel's alleged failures to object to the conduct of others and (2) trial counsel's own alleged conduct.

*Failures to object*

[¶19.] We first address the alleged errors consisting of trial counsel's failures to object to certain witness testimony and prosecutorial conduct. We need not recount each of these alleged shortcomings in detail, however, because each suffers from the same fatal defect: Chipps offers no analysis on the question of prejudice.

Chipps has the burden of establishing that "there is a reasonable probability that . . . the result of the proceeding would have been different" if counsel had not committed the errors alleged. *Craig*, 2014 S.D. 43, ¶ 38, 850 N.W.2d at 838 (quoting *Thomas*, 2011 S.D. 15, ¶ 28, 796 N.W.2d at 715). Therefore, because the proceeding in this case was a trial resulting in conviction, Chipps has the burden of establishing that the jury likely would have found him not guilty in the absence of the objectionable statements. Because the errors alleged here are failures to object, this showing necessarily requires an analysis of whether the absent objection would have been sustained if raised. If the objection would have been overruled, then the jury would still have been presented with the objected-to statement and could not reasonably be expected to return a different verdict. However, Chipps provides no analysis on the likelihood that any of the objections he now asserts his trial counsel should have raised below would have been sustained. Therefore, Chipps has failed to meet his heightened standard on direct appeal of showing that it is obvious on the record that a timely objection to any of these statements would have resulted in a different verdict.

*Defense counsel's closing argument*

[¶20.]  Chipps asserts that his trial counsel was ineffective because counsel admitted that the individual appearing in the Sonset and Walmart recordings was Chipps and that Chipps was guilty of the identity-theft charges. During closing arguments, defense counsel said the following:

> [I]n these videos you were shown an individual purchasing items at Wal-Mart. You've seen a picture of an individual pawning an item. It's Mr. Chipps. I submit Mr. Fitzgerald's wrong when he

> says that Mr. Chipps was trying to avoid his identity by covering up a tattoo.
>
> . . . .
>
> I'm sorry. I hate to say it, but it's not my burden to prove that he didn't steal something. But I'm here saying, yes, on these videos it's Mr. Chipps. Yes, these receipts show 159.87, 316.94. Yes, that pawn shop shows he pawned $130 worth of stuff, which he got $65 for it, by the way. I think that's 600 bucks.
>
> . . . .
>
> . . . Take a look at this evidence. I'm not asking for you to turn Mr. Chipps loose on every count here. We didn't walk into court yesterday wanting to do that, but what we're asking you to do is look independently at each of these charges and determine where is the evidence. What does it show Mr. Chipps is responsible for? What does it fail to show that he's responsible for? That's all.

It is not difficult to imagine that defense counsel's strategy might have been to garner some trust from the jury by conceding the obvious in order to increase the chances of an acquittal on the more serious charge of burglary. Although Chipps argues that "[i]dentity was at issue until trial counsel's closing[,]" Chipps has not established that it would have been objectively unreasonable for defense counsel to conclude that the jury was not likely to decide the identity issue in Chipps's favor. Therefore, it is not obvious on the record that Chipps was denied his Fifth and Sixth Amendment protections.

*Failure to rebut the State's assertion of motive*

[¶21.] Chipps next asserts that his trial counsel was ineffective because he "never called any witnesses to refute the State's assertions that the crimes were committed because Chipps was 'broke.'" During the State's opening statement, it said:

> What's also important from this perspective in the evidence is to show the motive for this crime of burglary, of theft, is that this

> man is broke. Because the evidence is going to show that when the credit card of Charlotte's gets rejected, he has to put the cigarettes back and all he's got money for is the $2 to pay for the cola. That's the only cash that he's got. Motive. I think that illustrates the motive.

According to the presentence investigation report conducted prior to sentencing in Lawrence County, Chipps reported an annual income of approximately $300,000 between tribal benefits[4] and employment. Thus, Chipps concludes that "[h]is mother could have easily provided testimony to refute the State's claim for motive."

[¶22.]        There are several problems with Chipps's argument. First, he offers no analysis as to the impact the State's assertion had on the jury's verdict. If it had no impact, then Chipps was not prejudiced regardless of whether his attorney offered testimony to refute it. Second, having an annual income of $300,000 does not necessarily refute the State's assertion that he needed money on the night of April 25, 2014.[5] Third, even if the testimony would have successfully refuted the State's assertion of motive, Chipps offers no analysis as to the likelihood that the jury would have returned a different verdict. Evidence of motive is not an element of the crime. If the jury probably would have found Chipps guilty on the remaining evidence, then he was not prejudiced. In the absence of such analysis, Chipps cannot claim that he was obviously deprived of his rights to counsel and a fair trial.

---

4.     Chipps is one-quarter American Indian and is an enrolled member of the Mdewakanton Indian Tribe in Prairie Island, Minnesota.

5.     Despite Chipps's previously-reported income, Dr. Manlove's report indicates the Tribe had reduced Chipps's annual income to approximately $24,000 "around one year" prior to Dr. Manlove's evaluation of Chipps in December 2014.

*Failure to raise a mental-illness defense*

[¶23.]　　　Next, Chipps asserts his trial counsel was ineffective because he did not argue at trial that Chipps was mentally ill and, therefore, that Chipps was incapable of forming the specific intent required for a conviction of second-degree burglary.　However, Chipps fails to make this argument on appeal as well. According to Chipps, he "was unquestionably mentally ill at the time of the alleged crimes."　Even if true, being mentally ill does not necessarily mean that Chipps was incapable of forming specific intent.　The term *mental illness* is defined as

> any substantial psychiatric disorder of thought, mood or behavior which affects a person at the time of the commission of the offense and which impairs a person's judgment, *but not to the extent that the person is incapable of knowing the wrongfulness of such act.*　Mental illness does not include abnormalities manifested only by repeated criminal or otherwise antisocial conduct . . . .

SDCL 22-1-2(24) (emphasis added).　In order to establish prejudice, Chipps must show that the jury probably would have returned a different verdict in the absence of trial counsel's deficient performance, which in turn requires a showing that a mental-illness defense likely would have been effective in convincing the jury that Chipps was incapable of specifically intending to commit the alleged crimes.　Chipps offers no such analysis.

[¶24.]　　　Even if he did, defense counsel might have simply made the strategic choice of choosing one defense over another.　Chipps himself asserts that there was little direct, physical evidence placing him at the Crisp residence.　This defense essentially says, "I was never there; therefore, I could not have committed the acts alleged."　However, the mental-illness defense Chipps asserts should have been raised would have been relevant only if he had committed the acts in question.　This

-12-

defense essentially says, "I committed the acts in question, but I did not intend to." Perhaps trial counsel concluded that such a defense would imply that Chipps was present at the Crisps' home and would detract from the arguably stronger position that Chipps was never present in the first place. Regardless, this example of alleged deficient conduct does not clearly establish that Chipps was deprived of his Fifth and Sixth Amendment rights.

*Failure to object to sentencing*

[¶25.] Chipps asserts his trial counsel should have objected to both of his sentences. According to Chipps, the Lawrence County court's failure to enter a guilty-but-mentally-ill sentence will delay his mental-health treatment until the commencement of his Meade County sentence 25 years from now. Chipps also asserts trial counsel should have objected to the written sentence in Meade County because it did not reflect the court's verbal order pronounced at sentencing that Chipps receive credit for time served. Neither of these arguments have merit.

[¶26.] There is no reason the Lawrence County court should have entered a guilty-but-mentally-ill sentence. Such a sentence is authorized "[i]f a defendant is found 'guilty but mentally ill' or enters that plea and the plea is accepted by the court[.]" SDCL 23A-27-38. However, a jury is not provided with a special verdict form of "guilty but mentally ill" unless "a defense of insanity or mental illness has been presented during a trial[.]" SDCL 23A-25-13. As Chipps points out, defense counsel did not present a mental-illness defense at trial. As we explained above, such a trial strategy was not necessarily objectively unreasonable.

[¶27.]     Further, Chipps once again fails to address the issue of prejudice. A finding of "guilty but mentally ill" does not necessarily result in a different sentence or treatment.

> If a defendant is found "guilty but mentally ill" . . . , the court shall impose *any sentence which could be imposed upon a defendant pleading or found guilty of the same charge.* If the defendant is sentenced to the state penitentiary, he shall undergo further examination and *may* be given the treatment that is psychiatrically indicated for his mental illness. *If* treatment is available, it *may* be provided through facilities under the jurisdiction of the Department of Social Services. The secretary of corrections *may* transfer the defendant from the penitentiary to other facilities under the jurisdiction of the Department of Social Services, *with the consent of the secretary of social services*, and return the defendant to the penitentiary after completion of treatment for the balance of the defendant's sentence.

SDCL 23A-27-38 (emphasis added). Chipps has offered no analysis regarding what treatment options would have been available to him had he been found guilty but mentally ill, nor has he addressed the likelihood that he would have been granted such treatment.

[¶28.]     Chipps's assertion that his trial counsel should have objected to the Meade County sentence is similarly meritless. It is true that the amended judgment of conviction from Meade County did not mention credit for time served. However, "[w]hen a court's written sentence differs from its oral sentence, . . . the oral sentence controls." *State v. Thayer*, 2006 S.D. 40, ¶ 7, 713 N.W.2d 608, 611 (citing *State v. Cady*, 422 N.W.2d 828, 830 (S.D. 1988) ("It is settled law in this state that the oral sentence is the only sentence and the written sentence must conform to it.")). At the sentencing hearing, the circuit court unambiguously announced that Chipps would receive credit for time served from June 27, 2014. Therefore, the oral

sentence controls; Chipps gets credit for time served and necessarily cannot establish prejudice.

[¶29.]    The record does not support Chipps's claim that the performance of his trial counsel clearly deprived him of his constitutional rights to counsel and a fair trial. Chipps has failed to provide any analysis on the issue of prejudice for the majority of the alleged deficiencies in his trial counsel's performance. The remaining allegations of deficient performance might simply be matters of trial strategy. The question whether these alleged deficiencies are in fact attributable to objectively reasonable trial strategy is not a question to be decided on direct appeal. Thus, we do not decide today whether Chipps's trial counsel was ineffective; we hold only that it is not obvious on the record that the defendant has been deprived of his constitutional rights to counsel and a fair trial. Therefore, we will not review the merits of Chipps's ineffective-assistance-of-counsel claim unless he decides to seek habeas relief in the future.

[¶30.]    ***2.    Whether Chipps's sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment.***

[¶31.]    Chipps asserts that his sentences are grossly disproportionate to the circumstances of his crimes. "We generally review a circuit court's decision regarding sentencing for abuse of discretion." *State v. Garreau*, 2015 S.D. 36, ¶ 7, 864 N.W.2d 771, 774. However, when the question presented is whether a challenged sentence is cruel and unusual in violation of the Eighth Amendment, we conduct a de novo review. *See Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 435, 121 S. Ct. 1678, 1685, 149 L. Ed. 2d 674 (2001) (requiring appellate courts to apply de novo standard in reviewing the proportionality of a fine

under the Eighth Amendment); *State v. Ball*, 2004 S.D. 9, ¶ 20, 675 N.W.2d 192, 199 ("[W]hether a constitutional violation has occurred is subject to de novo review." (quoting *Stallings v. Delo*, 117 F.3d 378, 380 (8th Cir. 1997))). Therefore, we conduct a de novo review to determine whether the sentences imposed in this case are grossly disproportionate to Chipps's offenses. *See Garreau*, 2015 S.D. 36, ¶ 7, 864 N.W.2d at 774.

[¶32.] The Eighth Amendment to the U.S. Constitution, which was extended to the states through the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments[.]" U.S. Const. amend. VIII.[6] "In *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001, 3009, 77 L. Ed. 2d 637, 649 (1983), the [United States] Supreme Court set forth a three-factor proportionality analysis under the Eighth Amendment." *State v. Bonner*, 1998 S.D. 30, ¶ 14, 577 N.W.2d 575, 579. The Supreme Court held that "a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Helm*, 463 U.S. at 290, 103 S. Ct. at 3009. According to *Helm*,

> a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the

---

6.   The United States Supreme Court's "cases addressing the proportionality of sentences fall within two general classifications. The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty." *Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 2021, 176 L. Ed. 2d 825 (2010) (plurality opinion). Because the present case involves a sentence-specific challenge to a term-of-years sentence, it belongs in the first class of cases, to which the analysis presented here applies.

> sentences imposed for commission of the same crime in other jurisdictions.

*Id.* at 292, 103 S. Ct. at 3011.

[¶33.] "In *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991), the Supreme Court substantially modified *Solem's* Eighth Amendment three-factor proportionality analysis." *Bonner*, 1998 S.D. 30, ¶ 15, 577 N.W.2d at 579. Writing for three justices, Justice Kennedy "stated what he believed to be 'some common principles that give content to the uses and limits of proportionality review.'" *Id.* (quoting *Harmelin*, 501 U.S. at 998, 111 S. Ct. at 2703 (Kennedy, J., concurring in part and concurring in the judgment)).[7] Those principles are:

> (1) reviewing courts must grant substantial deference to the legislature's broad authority to determine the types and limits of punishment; (2) the Eighth Amendment does not mandate adoption of any one penological theory; (3) marked divergences "are the inevitable, often beneficial result of the federal structure"; and (4) proportionality review by federal courts should be informed by objective factors.

*Id.* ¶ 15, 577 N.W.2d at 580 (quoting *State v. Gehrke*, 491 N.W.2d 421, 423 n.2 (S.D. 1992) (citing *Harmelin*, 501 U.S. at 998-99, 111 S. Ct. at 2703-04)). Justice Kennedy did not directly apply these principles in his Eighth Amendment analysis. Instead, these principles affect proportionality analysis only indirectly by leading to the conclusion that "[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are

---

7.    "[T]he *Harmelin* Court issued multiple opinions, none of which were fully supported by a majority of the justices." *Bonner*, 1998 S.D. 30, ¶ 15, 577 N.W.2d at 579. However, the Supreme Court has subsequently referred to Justice Kennedy's opinion as the controlling opinion of that case. *Graham*, 560 U.S. at 59-60, 130 S. Ct. at 2021-22 (plurality opinion).

'grossly disproportionate' to the crime." *Harmelin,* 501 U.S. at 1001, 111 S. Ct. at 2705 (Kennedy, J., concurring in part and concurring in the judgment).

[¶34.]        Justice Kennedy's opinion is also significant in another respect: it clarified that "comparative analysis within and between jurisdictions is not always relevant to proportionality review." *Id.* at 1004-05, 111 S. Ct. at 2707. Instead, the intra- and interjurisdictional analyses of *Helm's* second and third criteria "are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* at 1005, 111 S. Ct. at 2707. Thus, "[t]he proper role for comparative analysis of sentences . . . is to validate an initial judgment that a sentence is grossly disproportionate to a crime." *Id.*

[¶35.]        In answering the threshold question of gross disproportionality—i.e., in applying *Helm's* first criteria—the gravity of the offense refers to the offense's relative position on the spectrum of all criminality. *See id.* at 1002, 111 S. Ct. at 2705 ("From any standpoint, [possession of more than 650 grams of cocaine] falls in a different category from the relatively minor, nonviolent crime at issue in [*Helm*]."); *Helm,* 463 U.S. at 296, 103 S. Ct. at 3012 ("Helm's crime was 'one of the most passive felonies a person could commit.' . . . It is easy to see why such a crime is viewed by society as among the less serious offenses." (quoting *State v. Helm,* 287 N.W.2d 497, 501 (S.D. 1980) (Henderson, J., dissenting))). The Supreme Court has suggested a number of principles to aid in judging the gravity of an offense:

> [N]onviolent crimes are less serious than crimes marked by violence or the threat of violence. . . . Stealing a million dollars is viewed as more serious than stealing a hundred dollars . . . . [A] lesser included offense should not be punished more severely

> than the greater offense. . . . It also is generally recognized that attempts are less serious than completed crimes. Similarly, an accessory after the fact should not be subject to a higher penalty than the principal. . . . Most would agree that negligent conduct is less serious than intentional conduct. . . . A court, of course, is entitled to look at a defendant's motive in committing a crime. Thus a murder may be viewed as more serious when committed pursuant to a contract.
>
> This list is by no means exhaustive.

*Helm*, 463 U.S. at 292-94, 103 S. Ct. at 3011 (citations omitted).

[¶36.] In judging the gravity of an offense, a court may also consider certain past conduct of the defendant. As noted in the preceding paragraph, the circumstances of the crime of conviction affect the gravity of the offense. *See id.*; *Garreau*, 2015 S.D. 36, ¶ 12, 864 N.W.2d at 776 (considering defendant's reckless evasion of police in weighing the gravity of defendant's shooting of an officer while resisting arrest the subsequent day). Additionally, if the sentence is enhanced because of the offender's recidivism, then the gravity of his past offenses also contributes to the gravity of the present offense. *See Ewing v. California*, 538 U.S. 11, 28, 123 S. Ct. 1179, 1189, 155 L. Ed. 2d 108 (2003) (plurality opinion). The reason for this is that

> the State's interest is not merely punishing the offense of conviction, or the "triggering" offense: "It is in addition the interest in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law."

*Id.* at 29, 123 S. Ct. at 1190 (quoting *Rummel v. Estelle*, 445 U.S. 263, 276, 100 S. Ct. 1133, 1140, 63 L. Ed. 2d 382 (1980)).

[¶37.] The harshness of the penalty similarly refers to the penalty's relative position on the spectrum of all permitted punishments. *See Harmelin*, 501 U.S.

at 1001, 111 S. Ct. at 2705 (Kennedy, J., concurring in part and concurring in the judgment) ("Petitioner's life sentence without parole is the second most severe penalty permitted by law."); *Helm*, 463 U.S. at 297, 103 S. Ct. at 3013 ("Helm's sentence is the most severe punishment that the State could have imposed on any criminal for any crime."). The easiest comparison is between penalties that are qualitatively—rather than quantitatively—distinguishable. *See Helm*, 463 U.S. at 294 & n.18, 103 S. Ct. at 3012 & n.18 (drawing clear lines between capital and noncapital punishments as well as between sentences involving a deprivation of liberty and sentences with no deprivation of liberty). For sentences of imprisonment, the question is one of degree—e.g., "[i]t is clear that a 25-year sentence generally is more severe than a 15-year sentence[.]" *Id.* at 294, 103 S. Ct. at 3012. The possibility of parole is also considered in judging the harshness of the penalty. *Id.* at 294 n.19, 103 S. Ct. at 3012 n.19.[8]

[¶38.]    In light of the foregoing, our review of a sentence challenged under the Eighth Amendment is relatively straightforward. "First, we look to the gravity of the offense and the harshness of the penalty." *Id.* at 290-91, 103 S. Ct. at 3010, *quoted in Garreau*, 2015 S.D. 36, ¶ 9, 864 N.W.2d at 775. "This comparison rarely 'leads to an inference of gross disproportionality' and typically marks the end of our review[.]" *Garreau*, 2015 S.D. 36, ¶ 9, 864 N.W.2d at 775 (quoting *Bonner*, 1998 S.D. 30, ¶ 27, 577 N.W.2d at 582); *Harmelin*, 501 U.S. at 1004, 111 S. Ct.

---

8.    It should be noted, however, that "no penalty is *per se* constitutional." *Helm*, 463 U.S. at 290, 103 S. Ct. at 3009. In fact, "a single day in prison may be unconstitutional in some circumstances." *Id.* at 290, 103 S. Ct. at 3010. Therefore, a sentence of imprisonment is never constitutional solely because it is less than the maximum punishment authorized for any offense.

at 2707 (Kennedy, J., concurring in part and concurring in the judgment) ("[A] reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate . . . ." (quoting *Helm*, 463 U.S. at 290 n.16, 103 S. Ct. at 3009 n.16)). If the penalty imposed appears to be grossly disproportionate to the gravity of the offense, then we will compare the sentence to those "imposed on other criminals in the same jurisdiction" as well as those "imposed for commission of the same crime in other jurisdictions." *Helm*, 463 U.S. at 291, 103 S. Ct. at 3010.

*Second-degree burglary*

[¶39.]     Applying this analysis, we begin by examining the gravity of Chipps's offense. Chipps was convicted of second-degree burglary. This crime occurs when "[a]ny person . . . enters or remains in an occupied structure with intent to commit any crime, unless the premises are, at the time, open to the public or the person is licensed or privileged to enter or remain, under circumstances not amounting to first degree burglary[.]" SDCL 22-32-3.[9] Although this crime is no longer

---

9.     Second-degree burglary becomes first-degree burglary if any of the following additional elements are proven:

> (1) The offender inflicts, or attempts or threatens to inflict, physical harm on another;
>
> (2) The offender is armed with a dangerous weapon; or
>
> (3) The offense is committed in the nighttime.

SDCL 22-32-1.

statutorily defined as an inherently violent crime in South Dakota,[10] burglary has historically been viewed as a serious offense.

> Burglary is one of the most detestable crimes known to the law. Blackstone characterizes common law burglary as "a very heinous offence" carrying "terror . . . with it; . . . it is a forcible invasion of the right of habitation; . . . an invasion which in a state of nature would be sure to be punished with death."

*Commonwealth v. Le Grand*, 9 A.2d 896, 899 (Pa. 1939) (citation omitted) (quoting 4 William Blackstone, *Commentaries* *223); *see also Commonwealth v. Hope*, 39 Mass. (22 Pick.) 1, 8 (1839) ("[F]rom the earliest time, housebreaking by night and by day[] has been deemed a substantive crime of great aggravation, and been punished as such . . . ."). Indeed, burglary was punishable by death in some states well into the 20th century. *See Parker v. North Carolina*, 397 U.S. 790, 792, 90 S. Ct. 1458, 1460, 25 L. Ed. 2d 785 (1970) ("Petitioner was indicted for first-degree burglary, an offense punishable by death under North Carolina law."). "The main risk of burglary arises not from the simple physical act of wrongfully entering onto another's property, but rather from the possibility of a face-to-face confrontation between the burglar and a third party—whether an occupant, a police officer, or a bystander—who comes to investigate." *James v. United States*, 550 U.S. 192, 203, 127 S. Ct. 1586, 1594, 167 L. Ed. 2d 532 (2007), *overruled on other grounds by Johnson v. United States*, ___ U.S. ___, 135 S. Ct. 2551, 192 L. Ed. 2d

_____

10.  The Legislature defined the phrase *crime of violence* in SDCL 22-1-2(9). Although second-degree burglary was previously included among the list of specifically enumerated crimes of violence, the Legislature removed second-degree burglary from this list in 2005. 2005 S.D. Sess. Laws ch. 120, § 357.

569 (2015). In this case, Chipps entered the Crisps' home at a time of the evening when many people are still awake, increasing the danger of a confrontation.

[¶40.] "In conducting the threshold comparison between the crime and the sentence, we also consider other conduct relevant to the crime." *Garreau*, 2015 S.D. 36, ¶ 12, 864 N.W.2d at 776. The State filed a habitual-criminal information, and Chipps admitted to two prior felony convictions. Therefore, that history is relevant to an Eighth Amendment analysis of this sentence. *See Ewing*, 538 U.S. at 29, 123 S. Ct. at 1190 (plurality opinion); *Helm*, 463 U.S. at 296, 103 S. Ct. at 3013 ("[A] State is justified in punishing a recidivist more severely than it punishes a first offender."). Chipps has been previously convicted of committing the felonies of grand theft and possession of a controlled substance. Thus, not only has Chipps demonstrated a tendency to commit felonies, he has demonstrated a particular penchant for the same type of crimes charged here—taking for himself that which belongs to another.

[¶41.] Next, we must examine the harshness of Chipps's penalty. The circuit court sentenced Chipps to 20 years imprisonment for the second-degree burglary conviction. Normally, second-degree burglary is a Class 3 felony carrying a maximum sentence of 15 years imprisonment. SDCL 22-6-1(6), -32-3. However, Chipps's sentence was enhanced based on his criminal history; therefore, Chipps's offense is a Class 2 felony, SDCL 22-7-7, carrying a maximum penalty of 25 years imprisonment, SDCL 22-6-1(5). For more serious crimes, the Legislature has authorized sentences of death or mandatory life imprisonment (Class A felonies),

mandatory life imprisonment (Class B felonies), nonmandatory life imprisonment (Class C felonies), and 50 years imprisonment (Class 1 felonies). SDCL 22-6-1.

[¶42.]    Based on the foregoing, the sentence Chipps received for burglarizing the Crisps' home does not appear to be grossly disproportionate to the gravity of the offense. "Therefore, we will not conduct inter- and intrajurisdictional analyses; the objected-to sentence falls within the constitutional prescriptions of the Eighth Amendment." *Garreau*, 2015 S.D. 36, ¶ 13, 864 N.W.2d at 776.

*Identity theft*

[¶43.]    First, we examine the gravity of the offense. Chipps was convicted of four counts of identity theft. One way identity theft occurs is when "any person, without the authorization or permission of another person and with the intent to deceive or defraud[,] . . . [a]ccesses or attempts to access the financial resources of that person through the use of identifying information[.]" SDCL 22-40-8. Although Chipps obtained a relatively small amount of money from his use of Charlotte's cards, the appropriation of property is not the central injury addressed by identity-theft statutes. Instead, the harm contemplated by SDCL 22-40-8 is the appropriation of the very identity of another person—a more profound and personal violation of the victim than the mere theft of property. Chipps could have been found guilty of identity theft even if his attempts at using Charlotte's card were entirely unsuccessful. *See* SDCL 22-40-8. As noted above, Chipps's relevant criminal history displays a clear disregard for the property of others. *See supra* ¶ 40.

[¶44.]      Next, we examine the harshness of the penalty. The circuit court sentenced Chipps to five years imprisonment for each of the four identity theft convictions, which run concurrently with one another. Normally, identity theft is a Class 6 felony carrying a maximum sentence of two years imprisonment. SDCL 22-6-1(9), -40-8. Because of Chipps's prior felony convictions, these convictions were punished as Class 5 felonies, which carry a maximum sentence of five years imprisonment. SDCL 22-6-1(8). Although Chipps's identity-theft sentences individually reflect the maximum sentence permitted by statute for this offense, the court ordered these four sentences to run concurrently.[11] Divided among four convictions, Chipps will essentially serve the equivalent of only one-and-one-quarter years imprisonment for each identity-theft conviction—a length of time barely more than half of what he could have faced without sentence enhancement. As indicated above, the spectrum of permitted punishment includes much harsher penalties, *see supra* ¶ 41, and there is only one felony category of punishment less than that prescribed here—the two-year maximum Chipps would have faced absent sentence enhancement for his felony record.

[¶45.]      We have no difficulty concluding that a five-year sentence for four occurrences of identity theft does not appear to be grossly disproportionate. Therefore, the sentence is not unconstitutional, and our review ends.

---

11.   SDCL 22-6-6.1 gives a sentencing court discretion to impose concurrent or consecutive sentences when a defendant has been convicted of more than one offense.

*Grand theft*

[¶46.]	First, we examine the gravity of the offense. Chipps was convicted of grand theft. One way that theft occurs is when "[a]ny person . . . receives, retains, or disposes of property of another knowing that the property has been stolen, or believing that the property has probably been stolen, unless the property is received, retained, or disposed of with the intent to restore the property to the owner[.]" SDCL 22-30A-7. Chipps stole property worth more than $5,000, elevating his crime to grand theft. SDCL 22-30A-17 (defining grand theft as the theft of property exceeding $1,000 in value). Although this was a nonviolent offense that does not appear to have placed anybody in danger, Chipps's "theft should not be taken lightly. His crime was certainly not 'one of the most passive felonies a person could commit.'" *Ewing*, 538 U.S. at 28, 123 S. Ct. at 1189 (plurality opinion) (quoting *Helm*, 463 U.S. at 296, 103 S. Ct. at 3012) (commenting on grand theft in the amount of $1,200).[12]

[¶47.]	Next, we examine the harshness of the penalty. The Meade County circuit court sentenced Chipps to eight years imprisonment for the grand theft conviction but suspended two years of the sentence. Additionally, the court ordered Chipps to pay a fine of $10,000. The value of the property stolen in this case exceeded $5,000 but was less than $100,000; therefore, the theft was grand theft and was punishable as a Class 4 felony. SDCL 22-30A-17. A Class 4 felony carries

---

12.	Chipps's sentence on this conviction was not enhanced based on his criminal record. Therefore, his criminal history is not relevant to determining whether his sentence for grand theft was grossly disproportionate to the offense.

a maximum sentence of up to 10 years imprisonment and a maximum fine of $20,000. SDCL 22-6-1. As with identity theft, there are few felony categories with punishments less severe—and many categories more severe—than that prescribed by the Legislature for this offense. Although Chipps's offense was a Class 4 felony, the punishment he received was only slightly greater than the maximum permitted for a felony of one lesser degree.[13]

[¶48.] The sentence imposed on Chipps for grand theft does not appear to be grossly disproportionate to the gravity of Chipps's offense. Therefore, the sentence is not unconstitutional, and our review ends.

[¶49.] **3. Whether the circuit court erred by denying Chipps's motion for judgment of acquittal.**

[¶50.] Chipps asserts the circuit court erred by denying his motion for judgment of acquittal on the charges of second-degree burglary and identity theft. "We review the denial of a motion for judgment of acquittal as a question of law under the de novo standard." *State v. Overbey*, 2010 S.D. 78, ¶ 12, 790 N.W.2d 35, 40. Therefore, we give no deference to the circuit court's determination regarding the sufficiency of the evidence. On appeal, then, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *Overbey*, 2010 S.D. 78, ¶ 12, 790 N.W.2d at 40. "The State

---

13. With two years of his sentence suspended, Chipps will only have to serve six years and pay $10,000 for committing a Class 4 felony. The maximum sentence and fine for a Class 5 felony is five years and $10,000. SDCL 22-6-1(8).

may . . . prove all elements of an offense through circumstantial evidence." *State v. LaPlante*, 2002 S.D. 95, ¶ 30, 650 N.W.2d 305, 312. However, "[v]erdicts cannot be allowed to rest on mere suspicion, or upon a state of facts not shown to exist." *State v. Lee*, 48 S.D. 29, 35, 201 N.W. 703, 705 (1924); *see also United States v. Plenty Arrows*, 946 F.2d 62, 65 (8th Cir. 1991) ("Although the government is entitled to all reasonable inferences supporting the verdict, we cannot sustain a conviction 'based on a mere suspicion or possibility of guilt.'" (quoting *United States v. Robinson*, 782 F.2d 128, 129 (8th Cir. 1986))). Therefore, "we will set aside a jury verdict only when 'the evidence and the reasonable inferences to be drawn therefrom fail to sustain a rational theory of guilt.'" *State v. Guthrie*, 2001 S.D. 61, ¶ 47, 627 N.W.2d 401, 420-21 (quoting *State v. Hage*, 532 N.W.2d 406, 410 (S.D. 1995)).

[¶51.] Chipps essentially argues that his alleged mental illness resulted in a diminished capacity to form the specific intent required for convictions of second-degree burglary and identity theft. According to Chipps, "[w]hen dealing with specific intent crimes, the fact that Chipps had diminished capacity at the time of the alleged crime is relevant." As noted above, however, Chipps did not present a mental-illness defense at trial. Even if he had, the jury was presented with abundant circumstantial evidence of Chipps's guilt. It was for the jury to decide whether Chipps was the individual appearing in the video recordings from Sonset and Walmart. The jury was presented with evidence indicating that Chipps used Charlotte's card within minutes of the burglary at a gas station within one-and-one-half miles from the Crisps' home; that Chipps used Charlotte's card several more times a short time later at Walmart in neighboring Spearfish; that in each of the

video recordings, Chipps was seen wearing a jacket just like the one taken from the Crisps' home; that Chipps later pawned two pieces of jewelry identified by Charlotte as having been in her purse at the time it was stolen; that Charlotte's cell phone was recovered from Chipps's girlfriend's home, in Chipps's presence; and that the Sturgis Police Department indicated that Chipps is known to drive the same vehicle seen in the video recordings. Finally, trial counsel admitted that Chipps is the individual who appears in the recordings.[14] "Direct and circumstantial evidence have equal weight." *State v. Riley*, 2013 S.D. 95, ¶ 18, 841 N.W.2d 431, 437 (quoting *State v. Webster*, 2001 S.D. 141, ¶ 13, 637 N.W.2d 392, 396). "[I]n some instances 'circumstantial evidence may be more reliable than direct evidence.'" *Id.* (quoting *Webster*, 2001 S.D. 141, ¶ 13, 637 N.W.2d at 396). Therefore, we conclude that some "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Overbey*, 2010 S.D. 78, ¶ 12, 790 N.W.2d at 40.

## Conclusion

[¶52.] Chipps has largely ignored the question of prejudice on the majority of the deficiencies he alleges in his trial counsel's performance. Because the remaining deficiency claims might be attributable to acceptable trial strategy, Chipps has failed to establish that the performance of his trial counsel was so

---

14. The question whether trial counsel was ineffective because he admitted that the man seen on the video recordings was Chipps is an issue separate from whether the evidence presented was sufficient to sustain a conviction. Despite Chipps's claim to the contrary, his trial counsel's admission of identity does not necessarily entitle him to a reversal for ineffective assistance of counsel.

objectively unreasonable that Chipps was obviously denied his rights to counsel and a fair trial. Therefore, the issue of whether Chipps received ineffective assistance of counsel will not be decided outside of a petition for habeas corpus. The sentences Chipps received do not appear to be grossly disproportionate to the crimes he committed; therefore, the sentences are not cruel and unusual. Finally, the record reflects ample evidence upon which a reasonable jury could have found Chipps guilty beyond a reasonable doubt. Consequently, the circuit court did not err by denying Chipps's motion for judgment of acquittal. We affirm.

[¶53.]    ZINTER, SEVERSON, WILBUR, and KERN, Justices, concur.